UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNIVERSAL MORTGAGE CORPORATION,

        Plaintiff,

v.                                                    Case No. 09-CV-1142

WURTTEMBERGISCHE VERSIGHERUNG, AG.,

        Defendant.

## ORDER

Plaintiff Universal Mortgage Corporation ("Universal") is a mortgage lender who filed this action to recover losses it attributes to dishonest acts by one of its loan managers. Specifically, Universal seeks to recover these amounts pursuant to a fidelity bond[1] issued by defendant Wurttembergische Versigherung, AG. The defendant has filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) alleging that the bond does not cover Universal's claimed losses. The court agrees and will dismiss each of Universal's claims.

## BACKGROUND

Universal originates mortgage loans for resale to investors. (Compl. ¶ 6). To protect itself, Universal obtained a Mortgage Bankers Blanket Bond ("the Bond") from the defendant and from certain Underwriters at Lloyds of London. (Compl. ¶ 4).

---

[1] "Fidelity bonds are indemnity contracts that guarantee reimbursement for losses sustained by the insured resulting from the dishonesty of the insured's employees." *Continental Corp. v. Aetna Casualty & Surety Co.*, 892 F.2d 540, 543 (7th Cir. 1989).

The Bond indemnifies Universal for direct losses caused by employee dishonesty, and Insuring Clause 1 reads in relevant part:

> Direct financial loss sustained by the Assured subsequent to the Retroactive date and discovered by the Assured during the Bond Period by reason of and directly caused by: (a) dishonest acts by any Employee of the Assured, whether committed alone or in collusion with others, which dishonest acts were committed by the Employee with the manifest intent to obtain and resulted in the receipt of Improper Personal Financial Gain for said Employee, or for the persons acting in collusion with said Employee...

(Compl. ¶ 4 and Ex. 1). The Bond also provides for a number of exclusions from coverage. One such exclusion is Exclusion 18, which states that the Bond will not cover: "Any loss resulting from the Assured having repurchased or having been required to repurchase a Real Estate Loan from an Investor or Secondary Market Institution except when covered under Insuring Clause 5(b), 6, 9(c) or 11." (Ex. 1).

Universal sells its mortgage loans to investors and requires its loans to meet the standards of the Federal National Mortgage Association (FNMA). Universal warrants to investors that its mortgage loans meet the standards. If an investor later discovers that a particular loan it purchased from Universal fails to comply with the FNMA standards, then Universal commits to repurchase the loan. (Compl. ¶ 6).

Universal employees ensure compliance with FNMA standards by confirming that mortgage applications accepted and funded by Universal meet the standards. One FNMA standard monitored by employees is the requirement that borrowers taking out purchase money mortgages make down payments equal to a specified percentage of the purchase price. The standard prohibits use of programs providing

the borrower with funds to use as a down payment in which the down payment assistance exceeds a specified percentage of the mortgage amount. Universal employed Ray Hightower ("Hightower") as the Regional Wholesale Manager for its Palm Harbor, Florida, office. Hightower was responsible for supervising other employees who processed Universal's mortgage applications and for verifying compliance with FNMA standards. (Compl. ¶ 7).

Hightower did not faithfully execute his duties to ensure compliance, however. Hightower entered into a conspiracy with representatives of a mortgage brokerage company, Global Mortgage, whereby he accepted mortgage loan applications with down payment assistance that violated FNMA standards. Hightower accomplished the scheme by directing mortgage processors working in his office to approve more than 35 non-compliant mortgages. In return for his help, Hightower received personal payments from Global Mortgage. (Compl. ¶¶ 8, 9). The non-compliant mortgages were sold to investors and many of the loans later went into default. When it was discovered that the mortgages did not meet FNMA standards, Universal was obliged to repurchase the loans pursuant to its contracts with investors. (Compl. ¶ 10).

On May 2, 2008, Universal notified the defendant's designated representative that it suspected losses resulting from employee dishonesty within the terms of Insuring Clause 1 of the Bond. (Compl. ¶ 11). Approximately six weeks later, on June 24, 2008, Universal filed a sworn proof of loss. Universal continued to discover

non-compliant loans improperly made under Hightower's supervision; the loss amount claimed against the defendant now totals $833,332. (Compl. ¶ 12). The defendant's representative requested additional information from Universal in June and August 2008. The defendant ultimately denied Universal's claim for coverage more than one year later, in November 2009. (Compl. ¶ 17).

Universal filed suit on December 14, 2009, and asserts three claims against the defendant. Universal alleges breach of contract, failure of timely payment in violation of Wisconsin Statute § 628.46, and bad faith failure to pay. In connection with its claims, Universal seeks compensatory damages, statutory damages and interest, and punitive damages. (Compl. ¶¶ 13-19).

## ANALYSIS

Federal Rule of Civil Procedure 12(b)(6) allows the court to dismiss an action that "fails to state a claim upon which relief can be granted." When a court resolves a Rule 12(b)(6) motion, it takes all well-pleaded allegations as true and draws all reasonable inferences in favor of the plaintiff. *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008). The court may consider documents attached to the pleading as exhibits in deciding a motion to dismiss because such documents are "a part of the pleading for all purposes." Fed. R. Civ. P. 10(c); *see also Venture Associates Corp. v. Zenith Data Systems Corp.*, 987 F.2d 429, 431 (7th Cir. 1993).

The defendant asks the court to dismiss each of Universal's claims because the asserted losses are not covered under the terms of the Bond. The Bond states

-4-

that it covers "direct financial loss" that is "directly caused by" dishonest acts of an employee. (Compl. ¶ 4 and Ex. 1). There are competing interpretations of loss directly caused by employee dishonesty. Some courts understand such a loss to be one proximately caused by the employee's actions, such that the acts need not be the "sole" or "immediate" cause of the loss. *See e.g. Scirex Corp. v. Federal Ins. Co.*, 313 F.3d 841, 848-50 (3d Cir. 2002). Other courts interpret a loss directly caused by employee dishonesty to require a narrower definition, described as "direct means direct." *See e.g. Vons Companies, Inc. v. Federal Ins. Co.*, 212 F.3d 489, 492-93 (9th Cir. 2000). The Wisconsin courts[2] have aligned themselves with the "direct means direct" school of thought and reject the contention that "direct" is synonymous with "proximately" or "proximate cause" for purposes of coverage under a fidelity bond. *See Tri City National Bank v. Federal Ins. Co.*, 2004 WI App 12, ¶¶ 21-22, 268 Wis.2d 785, 674 N.W.2d 617.

The defendant argues that Universal's losses are not directly caused by employee dishonesty under a "direct means direct" interpretation because Universal seeks liability coverage for its contractual obligation to repurchase loans from third-party investors, and not fidelity coverage for losses directly caused by Hightower's actions. The defendant relies strongly upon the decision of the Wisconsin Court of Appeals in *Tri City National Bank v. Federal Insurance Company* to support its

---

[2]The parties assume that Wisconsin law applies to their dispute and the court will do likewise.

-5-

contention. In *Tri City*, employees of the plaintiff bank engaged in a conspiracy to fraudulently obtain mortgage loans for borrowers who did not otherwise qualify for the loans. 2004 WI App 12, ¶ 2, 674 N.W.2d at 790. The bank employees falsely verified to mortgage companies that the borrowers had sufficient amounts to cover a down payment and, after approval of a mortgage, the bank employees would issue cashier's checks for use at the closing. *Id.* Upon closing, the outside conspirator would pay the bank employees and repay the bank for the cashier's check. *Id.* Many of the loans associated with the scheme went into default and the fraud was eventually uncovered. *Id.* The mortgage companies then sued the bank to recover their losses. *Id.* at ¶ 3, 674 N.W.2d at 791. The bank settled the claims of the mortgage companies and then sought reimbursement from the defendant insurance company pursuant to a fidelity bond. *Id.* at ¶ 5, 674 N.W.2d at 791. The fidelity bond provided coverage for "losses resulting directly from dishonest or fraudulent acts committed by an Employee." *Id.* at ¶ 15, 674 N.W.2d at 623. The Wisconsin Court of Appeals determined that the bank's losses did not result directly from the employee actions and affirmed dismissal of the action for failure to state a claim. *Id.* at ¶ 1, 674 N.W.2d at 619. In reaching its conclusion, the court emphasized the difference between a fidelity bond, like the one at issue, and a liability policy. It noted that a liability policy "covers the liability of the insureds to a third-party while fidelity bonding covers the loss of property owned by the insureds or held by the insureds, as a consequence of employee dishonesty." *Id.* at ¶ 13, 674 N.W.2d at 622

Case 2:09-cv-01142-JPS   Filed 07/30/10   Page 6 of 17   Document 16

(quoting *Aetna Casualty & Surety Co. v. Kidder, Peabody & Co., Inc.*, 246 A.D.2d 202, 211, 676 N.Y.S.2d 559, 565 (1998)). The Wisconsin Court of Appeals also found that the bank's loss in settling the claims of the mortgage companies was not the direct result of employee dishonesty because the bank's liability only occurred after the mortgage loans went into default. *Id.* at ¶ 18, 674 N.W.2d at 623.

This court reaches the same conclusion in the instant case as the Wisconsin Court of Appeals reached in *Tri City*. The fidelity bond issued to Universal does not cover Universal's claimed losses because the losses were not "directly caused by" Hightower's actions. Universal issued mortgage loans that did not comply with the FNMA standards. However, the dispersal of loan proceeds to non-qualifying borrowers did not inflict loss upon Universal. Indeed, no loss could be inflicted until the mortgages went into default. *See Tri City*, 2004 WI App 12, ¶ 18, 674 N.W.2d at 623 (stating that "the losses did not exist until the unsuitable mortgage holders defaulted on their loans"). However, Universal sold its mortgage loan to investors before any default occurred and suffered no direct financial harm when the loans later defaulted. The only parties adversely affected at the time the non-FNMA-compliant mortgages went into default were the investors who purchased the mortgages. Universal first suffered loss when it was required to repurchase the non-compliant loans. *See id.* ("The losses did not result directly from dishonest or fraudulent acts committed by the employees, as the losses did not exist until the unsuitable mortgage holders defaulted on their loans and the mortgage companies

-7-

Case 2:09-cv-01142-JPS   Filed 07/30/10   Page 7 of 17   Document 16

sued [the plaintiff bank]."). Thus, Universal first suffered a loss when the buy-back provisions in its contracts were enforced and not earlier when it dispersed loan proceeds, or when it sold the mortgages to investors, or when the borrowers initially defaulted.

The losses Universal incurred by repurchasing the non-conforming mortgages were not the immediate result of Hightower's approval of unqualified borrowers. Instead, the costs were the immediate result of Universal's contractual obligations to repurchase. If Universal was not subject to buy-back provisions in its contracts with investors, it would not be financially affected by the default of the borrowers because Universal no longer owned the mortgages. *See RBC Mortgage Co. v. National Union Fire Ins. Co. of Pittsburgh*, 812 N.E.2d 728, 735 (Ill. App. 2004) (stating that the plaintiff's losses were not derived directly from the conduct of its employee, but from the plaintiff's breach of the warranty contained in its brokerage agreement with the loan broker to indemnify the broker if the loan packages contained untrue statements, because "had there been no contractual liability on the part of the [plaintiff] for the fraudulent loan packages, [the plaintiff] would not have incurred monetary losses."). Thus, the losses Universal claims for the required repurchase were "directly caused by" its contractual obligations and not by employee dishonesty.

Further, Universal's claimed losses do not represent "direct financial loss" because they were contingent upon several future events. First, they were

contingent upon borrowers defaulting on the mortgages. Default is not the inevitable result of issuing mortgages to individuals who do not meet FNMA standards. If the borrowers had paid or continued to make their payments in a timely manner, no loss would have resulted. Therefore, no party experienced "loss" until the loans went into default. Second, the repurchase costs were contingent upon enforcement of contractual repurchase obligations. If investors had not uncovered the mortgage irregularities and enforced the buy-back provision, Universal would not have experienced any loss. These intervening events had to transpire before Universal felt any financial injury related to Hightower's approval of unqualified borrowers. Therefore, the loss Universal asserts is neither "direct financial loss" nor is it "directly caused by" employee dishonesty and the Bond does not provide coverage.

The U.S. District Court in the District of Utah came to the same conclusion on nearly-identical facts in *Direct Mortgage Corp v. National Union Fire Ins. Co.*, 625 F. Supp. 2d 1171, 1177-78 (D. Utah 2008). In *Direct Mortgage*, the plaintiff mortgage company originated mortgages and resold them to investors. *Id.* at 1173. An employee of the mortgage company falsified documents necessary to close loans by changing appraisal values, falsifying income verifications, and modifying property descriptions. *Id.* The investors who purchased the fraudulently-obtained loans then demanded that the mortgage company buy back the loans pursuant to obligations in the sales agreements. *Id.* The mortgage company settled with its investors and then filed a claim with the defendant insurer under the company's fidelity bond. *Id.*

-9-

The fidelity bond covered "loss resulting from dishonest or fraudulent acts committed by an Employee." *Id.* at 1174. The court granted partial summary judgment to the defendant insurer after finding that the loss suffered by the mortgage company was indirect and not covered by the bond. *Id.* at 1172. In rendering its decision, the court explained that the loss suffered by the plaintiff mortgage company in having to repurchase fraudulently-obtained mortgages was not direct because the "loss was contingent on the occurrence of a series of events that were not inevitable, and such a contingency takes the loss outside the scope of the Fidelity Bond." *Id.* at 1177-78. The plaintiff mortgage company argued that it suffered a direct loss at the time the loans were issued and sold to third-parties, and not after its buy-back obligations were enforced, because it was "on the hook" for violation of the warranty as soon as the loans were issued and sold. *Id.* at 1178. However, the court rejected this argument stating: "although [the plaintiff] was potentially 'on the hook' as soon as the loans were sold, its loss was theoretical at that point." *Id.*

Universal disagrees with the court's determination in *Direct Mortgage* and argues that this court should not reach the same conclusion. Universal argues that it suffered "direct" losses at the time mortgage proceeds were dispersed to unqualified borrowers, and not at the time investors enforced the contractual provisions requiring it to repurchase the loans. However, as the court previously noted, distribution of the loan proceeds, standing alone, does not inflict a loss. The borrower, even if he or she is unqualified under FNMA standards, may make the

-10-

required repayments on the loan. A financial loss only occurs after the borrower defaults for failing to do so (though even this event did not inflict financial harm on Universal since it no longer owned the mortgages). Further, the authority cited by Universal does not persuade the court otherwise. Universal relies upon *Portland Federal Employees Credit Union v. Cumis Ins. Society, Inc.*, 894 F.2d 1101 (9th Cir. 1990), *Fitchburg Savings Bank v. Massachusetts Bonding & Ins. Co.*, 174 N.E. 324 (Mass. 1931), and dicta appearing in *Tri City* to support its assertion. However, these cases are distinguishable and do not convince the court that Universal incurred loss at the time it distributed loan proceeds. The court in *Portland Federal* addressed the question of whether a bank's losses due to improper loans and unapproved contracts fell within the fidelity bond's definition of "property," "money," or "securities." 894 F.2d at 1104. The Ninth Circuit Court of Appeals did not address the issue of whether the bank employee's actions resulted in a "direct" or "indirect" loss. Indeed, the court specifically noted that it was *not* addressing the question of whether the plaintiff's loss was direct or indirect because the district court reached its decision based solely on interpretations of the bond terms "property" and "money" to exclude coverage of the plaintiff's loan losses. *Id.* at 1105.[3] ("The district court based its decision rejecting coverage on its interpretation of 'property' and 'money,'

---

[3]The court notes that Universal quotes a passage in its brief that it attributes to *Portland Federal*, which states, in part: "In terms of a loss with respect to the making of loans, a bank suffers a loss when funds are disbursed, like in the case at bar, due to the employees wrongful conduct." (Pl.'s Br., at 10-11). However, this quotation does not appear anywhere within *Portland Federal*. *See* 894 F.2d 1101.

-11-

and therefore did not reach the question of whether part or all of Portland's loss was direct as opposed to indirect or consequential. We leave this determination for the district court on remand to consider in the first instance."). The case does not support Universal's argument that it suffered direct loss upon issuing loan proceeds.

*Fitchburg Savings Bank* is similarly unhelpful. In this 1931 case, the Supreme Judicial Court of Massachusetts stated that "loss" under the fidelity bond at issue meant the deprivation of money due to the fraudulent acts of employees, regardless of the security the bank had for the loss. *Fitchburg Savings Bank*, 174 N.E. at 328. The case arose from a bank treasurer's scheme to fraudulently draw checks and generate notes to back them in order to pay off debts he owed. *Id.* at 326-27. The defendant insurance company denied coverage of the losses under a fidelity bond because it was not reported within the time period required. *Id.* at 329. The case did not turn on the nature of loss as direct or indirect, nor did it involve expenses incurred due to contractual obligations to third parties. The court does not find it to be determinative on the issue of direct loss.

Finally, Universal relies on dicta in *Tri City* to support the contention that it suffered direct losses upon dispersing loan proceeds to the unqualified borrowers. However, the cited statements do not persuade the court that a loss occurred simply because Universal issued loan proceeds. The portion of *Tri City* that Universal cites appears within the Wisconsin Court of Appeals's analysis of a separate case, *First American State Bank v. Continental Ins. Co.*, 897 F.2d 319 (1990). In the relevant

-12-

section, the Wisconsin Court of Appeals rejects the conclusion reached in *First American* and notes that the Eighth Circuit Court of Appeals wrongly predicted how the Iowa Supreme Court would interpret "directly resulting from" language appearing within a fidelity bond. *Tri City*, 2004 WI App 12, ¶ 28, 674 N.W.2d at 627. The court further distinguishes *First American* by noting that in *First American*, the plaintiff bank was also a victim of the fraudulent loan scheme arising when its bank president convinced customers to take out loans and give him the proceeds in exchange for his promissory notes. *Id.* at ¶ 26, 674 N.W. 2d at 626-27. After distinguishing the case, the Wisconsin Court of Appeals stated that the ultimate result reached in *First American* "may be correct as the bank did appear to suffer some direct loss as a result of the bank president's dishonest acts." *Id.* at ¶ 29, 674 N.W.2d at 627. However, the dicta from *Tri City* does not alter the court's analysis. The bank in *First American* "appeared" to suffer loss because it was never repaid for the loan fraudulently issued to customers. The Wisconsin Court of Appeals specifies that in *First American*, the bank's "loan proceeds were lost." *Id.* However, the situation in the instant case differs from *First American* because Universal did not suffer the loss of its loan proceeds. Instead, the fraudulently-obtained mortgages were purchased by investors. Thus, Universal *was* compensated for the loan amounts issued and it was only after enforcement of contractual buy-back obligations that Universal suffered any loss.

-13-

The losses Universal suffered were not "direct losses," nor were they "directly caused by" the dishonest acts of Hightower. Therefore, the losses do not fall within the coverage afforded under the terms of the Bond. However, Universal's claimed losses are not covered for an additional reason. The Bond explicitly excludes losses resulting from "having repurchased or having been required to repurchase a Real Estate Loan from an Investor." (Ex. 1). The damages that Universal asserts are the immediate consequence of having to repurchase non-conforming mortgages from the parties to whom they were sold. Therefore, the terms of the fidelity bond exclude coverage of Universal's claimed losses.

Indeed, the express terms of the Bond seem to present an insurmountable obstacle to Universal's claims. Universal, however, attempts to overcome the plain language of the exclusion by arguing that its losses are not losses "resulting from" the repurchase of loans. Universal instead asserts that its losses result from disbursement of its own proceeds in the form of loans to unqualified borrowers. The court previously addressed this argument and concluded that Universal suffered no financial harm until forced to buy back its loans from investors. Therefore, the claimed losses fall squarely within the definition of losses excluded by the Bond.

The Bond issued to Universal does not cover the losses Universal claims. Consequently, the defendant's refusal to cover those losses cannot constitute a violation of the Bond and Universal's breach of contract claim fails as a matter of

-14-

law. The exclusion of Universal's claims from coverage similarly dooms its remaining claims for failure of timely payment and bad faith failure to pay.

Universal alleges in its complaint that the defendant violated Wisconsin Statute § 628.46 by failing to timely reimburse Universal after receiving notice of its claims. The statute reads in relevant part:

> Unless otherwise provided by law, an insurer shall promptly pay every insurance claim. A claim shall be overdue if not paid within 30 days after the insurer is furnished with written notice of the fact of a covered loss and of the amount of the loss...Any payment shall not be deemed overdue when the insurer has reasonable proof to establish that the insurer is not responsible for the payment, notwithstanding that written notice has been furnished to the insurer.

Wis. Stat. § 628.46. The statute expressly states that it does not apply in instances when the insurer has "reasonable proof" to show that the insurer is not responsible for paying the claim. "Reasonable proof" under § 628.46 is information sufficient to "allow a reasonable insurer to conclude that it may not be responsible for payment of a claim," which exists when the "coverage issue is fairly debatable." *Kontowicz v. American Standard Ins. Co.*, 2006 WI 48, ¶ 48, 714 N.W.2d 105, 117 (quoting *Allstate Ins. Co. v. Konicki*, 186 Wis.2d 140, 160, 519 N.W.2d 723 (Ct. App. 1994)). Reasonable proof that the defendant is not responsible for paying Universal's claim clearly exists here. The court's conclusion that the Bond does not cover the losses at issue and the authority it relies upon establish that the issue of coverage is "fairly debatable." The defendant does not owe any payment to Universal because the

Case 2:09-cv-01142-JPS   Filed 07/30/10   Page 15 of 17   Document 16

Bond does not cover Universal's losses. Therefore, the statutory requirement of prompt payment is not implicated and Universal's claim must fail.

Universal's last claim is one for bad faith failure to pay. To show bad faith failure to pay an insurance claim, a plaintiff must demonstrate the "absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim." *Anderson v. Continental Ins. Co.*, 85 Wis.2d 675, 691, 271 N.W.2d 368, 376 (1978). An insurer lacks a reasonable basis for denying a claim when the insurer's responsibility to pay the claim "is not fairly debatable." *Mowry v. Badger State Mutual Casualty Co.*, 129 Wis.2d 496, 516-17, 385 N.W.2d 171, 181 (1986). The defendant's responsibility to pay the claim at issue here cannot fulfill the requirement. The court determined that the Bond does not provide coverage for Universal's asserted losses. The court's decision establishes that the defendant's responsibility to pay the claim was indeed debatable. The defendant's failure to pay a claim which it is not required to pay cannot establish bad faith and Universal's claim fails as a matter of law.

Accordingly,

**IT IS ORDERED** that the defendant's motion to dismiss (Docket #7) be and the same is hereby **GRANTED** as to each of the plaintiff's claims. and this action be and the same is hereby **DISMISSED**.

The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 30th day of July, 2010.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge

-17-

Case 2:09-cv-01142-JPS   Filed 07/30/10   Page 17 of 17   Document 16